1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

SALLIE J. PROCTOR,

NO.  C13-5624-RSL-JPD

9

Plaintiff,

10

v.

REPORT AND
RECOMMENDATION

11

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

12

Defendant.

13

14      Plaintiff Sallie J. Proctor appeals the final decision of the Commissioner of the Social

15   Security Administration ("Commissioner") which denied her applications for Disability

16   Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI

17   of the Social Security Act, 42 U.S.C. §§ 401-33 and 1381-83f, after a hearing before an

18   administrative law judge ("ALJ").  For the reasons set forth below, the Court recommends that

19   the Commissioner's decision be REVERSED and REMANDED.

20                    I.      FACTS AND PROCEDURAL HISTORY

21      Plaintiff is a 50 year old woman with at least a high school education.  Administrative

22   Record ("AR") at 215, 260.  Her past work experience includes employment as a housekeeper,

23   machinist, and office manager/service writer.  AR at 116.  Plaintiff was last gainfully

24   employed on August 27, 2007.  AR at 205.

REPORT AND RECOMMENDATION - 1

1    On October 27, 2007, plaintiff filed a claim for SSI payments.  On the same date, she

2    filed an application for DIB, alleging an onset date of August 27, 2007.  *Id.*  Plaintiff asserts

3    that she is disabled due to scoliosis, fibromyalgia, sciatica, and problems with her joints and

4    knees.  AR at 115, 205.

5    The Commissioner denied plaintiff's claim initially and on reconsideration.  AR at 202.

6    Plaintiff requested a hearing which took place on December 17, 2009.  AR at 20-42, 202.  On

7    February 16, 2010, the ALJ issued a decision finding plaintiff not disabled and denied benefits

8    based on a finding that plaintiff could perform a specific job existing in significant numbers in

9    the national economy.  AR at 6-19.  Plaintiff's administrative appeal of the ALJ's decision was

10   denied by the Appeals Council, AR at 1-3, making the ALJ's ruling the "final decision" of the

11   Commissioner as that term is defined by 42 U.S.C. § 405(g).  Plaintiff appealed the

12   Commissioner's decision to the U.S. District Court for the Western District of Washington.

13   On December 22, 2011, the U.S. District Court for the Western District of Washington

14   reversed the Commissioner's decision and remanded the case back to the Commissioner for

15   further administrative proceedings in light of errors made by the ALJ in evaluating plaintiff's

16   credibility determinations and because of errors made in determining plaintiff's residual

17   functional capacity ("RFC").  AR at 345-67.  As a result of the remand, a hearing was held on

18   September 18, 2012, in which an impartial vocational expert, an impartial medical expert, and

19   plaintiff's husband appeared to testify.  AR at 225-91.  Subsequent to that hearing, the plaintiff

20   had a consultative examination.  The plaintiff then requested a supplemental hearing to cross-

21   examine the consultative examining doctor.  The supplemental hearing took place on January

22   30, 2013.  AR at 292-344.  On March 28, 2013, the ALJ issued a decision finding plaintiff not

23   disabled and denied benefits based on a finding that plaintiff could perform a specific job

24   existing in significant numbers in the national economy.  AR at 199-222.  Plaintiff's

administrative appeal of the ALJ's decision was denied by the Appeals Council, making the

ALJ's ruling the "final decision" of the Commissioner as that term is defined by 42 U.S.C. §

405(g).  On July 26, 2013, plaintiff timely filed the present action challenging the

Commissioner's decision.  Dkts. 1-3.

II.     JURISDICTION

Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3).

III.     STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of

social security benefits when the ALJ's findings are based on legal error or not supported by

substantial evidence in the record as a whole.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th

Cir. 2005).  "Substantial evidence" is more than a scintilla, less than a preponderance, and is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750

(9th Cir. 1989).  The ALJ is responsible for determining credibility, resolving conflicts in

medical testimony, and resolving any other ambiguities that might exist.  *Andrews v. Shalala*,

53 F.3d 1035, 1039 (9th Cir. 1995).  While the Court is required to examine the record as a

whole, it may neither reweigh the evidence nor substitute its judgment for that of the

Commissioner.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  When the evidence is

susceptible to more than one rational interpretation, it is the Commissioner's conclusion that

must be upheld.  *Id.*

The Court may direct an award of benefits where "the record has been fully developed

and further administrative proceedings would serve no useful purpose."  *McCartey v.*

*Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)).  The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id.* at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## IV.    EVALUATING DISABILITY

As the claimant, Ms. Proctor bears the burden of proving that she is disabled within the meaning of the Social Security Act (the "Act").  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (internal citations omitted).  The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is disabled under the Act only if her impairments are of such severity that she is unable to do her previous work, and cannot, considering her age, education, and work experience, engage in any other substantial gainful activity existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the burden of proof during steps one through four.  At step five, the burden shifts to the Commissioner.  *Id.*  If a claimant is found to be disabled at any step in the sequence, the inquiry ends without the need to consider subsequent steps.  Step one asks whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R.

§§ 404.1520(b), 416.920(b).[1]  If she is, disability benefits are denied.  If she is not, the Commissioner proceeds to step two.  At step two, the claimant must establish that she has one or more medically severe impairments, or combination of impairments, that limit her physical or mental ability to do basic work activities.  If the claimant does not have such impairments, she is not disabled.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant does have a severe impairment, the Commissioner moves to step three to determine whether the impairment meets or equals any of the listed impairments described in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).  A claimant whose impairment meets or equals one of the listings for the required twelve-month duration requirement is disabled.  *Id.*

When the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner must proceed to step four and evaluate the claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the Commissioner evaluates the physical and mental demands of the claimant's past relevant work to determine whether she can still perform that work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant is able to perform her past relevant work, she is not disabled; if the opposite is true, then the burden shifts to the Commissioner at step five to show that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 416.920(g); *Tackett*, 180 F.3d at 1099, 1100.  If the Commissioner finds the claimant is unable to perform other work, then the claimant is found disabled and benefits may be awarded.

---

[1] Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical and/or mental activities, and gainful, i.e., performed for profit.  20 C.F.R. § 404.1572.

V.   DECISION BELOW

On March 28, 2013, the ALJ issued a decision finding the following:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.   The claimant has not engaged in substantial gainful activity since August 27, 2007, the alleged onset date.

3.   The claimant has the following severe impairments: Fibromyalgia Syndrome; Degenerative Disc Disease of the Lumbar and Cervical spine with Spasms and Scoliosis; and Alcohol Dependence.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she has no limit in her ability to sit.  She must have the option to change positions from sitting to standing while remaining on task, at one hour intervals.  She can never climb ladders, ropes, or scaffolds and never crawl. She can balance, stoop, kneel, crouch, and climb ramps and stairs no greater than occasionally.  Bilaterally, she can perform overhead reaching no greater than occasionally.  She cannot have concentrated exposure to workplace hazards including unprotected heights, extreme cold, wetness, and humidity.

6.   The claimant is unable to perform any past relevant work.

7.   The claimant was born on XXXXX, 1963 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.[2]

8.   The claimant has at least a high school education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

---

[2]  The actual date is deleted in accordance with Local Rule CR 5.2, W.D. Washington.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 27, 2007, through the date of this decision.

AR at 205-17.

## VI.     ISSUES ON APPEAL

The principal issues on appeal are:

1.     Whether the ALJ's credibility finding was reasonable?

2.     Whether the ALJ reasonably evaluated the medical record?

3.     Whether the ALJ reasonably weighted the lay witness testimony of plaintiff's husband?

4.     Whether the ALJ erred in determining plaintiff's residual functional capacity?

5.     Whether the ALJ's step five findings were proper?

Dkt. 15 at 1.

## VII.     DISCUSSION

A.     The ALJ Erred in Finding Plaintiff Not Credible

The ALJ found plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." AR at 208.  Specifically, the ALJ discredited plaintiff on the grounds that: (1) the objective medical findings were rather mild and did not support plaintiff's allegation of disability; (2) plaintiff appeared to be exaggerating her symptoms and was motivated by her desire to get benefits; (3) plaintiff's use of alcohol during the claimed disability period, and inconsistent use of medication, made her reports somewhat unreliable; (4) plaintiff's failure to follow her doctors recommendations to exercise regularly made her reports somewhat

1  unreliable; (5) plaintiffs failure to see a specialist, get further epidural injections, or otherwise

2  seek out additional treatment made her reports somewhat unreliable; (6) plaintiff's daily

3  activities made her reports somewhat unreliable; and (7) the presence of positive "Waddell

4  signs" were indicative of plaintiff "exaggerating" her symptoms.  AR at 208-12.

5         Plaintiff argues that "none of the evidence cited by the ALJ [are] convincing reason[s]

6  to reject plaintiff's testimony."  Dkt. 15 at 14.  The ALJ substantially erred in his credibility

7  analysis, requiring remand for further proceedings.

8                    *1.     Standard for Evaluating Credibility*

9         Credibility determinations are within the province of the ALJ's responsibilities, and

10 will not be disturbed, unless they are not supported by substantial evidence.  A determination

11 of whether to accept a claimant's subjective symptom testimony requires a two-step analysis.

12 20 C.F.R. §§ 404.1529, 416.929; *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); Social

13 Security Ruling ("SSR") 96-7p.  First, the ALJ must determine whether there is a medically

14 determinable impairment that reasonably could be expected to cause the claimant's symptoms.

15 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82; SSR 96-7p.  Once a

16 claimant produces medical evidence of an underlying impairment, the ALJ may not discredit

17 the claimant's testimony as to the severity of symptoms solely because they are unsupported by

18 objective medical evidence.  *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (en banc);

19 *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1988).  Absent affirmative evidence showing

20 that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for

21 rejecting the claimant's testimony.  *Smolen*, 80 F.3d at 1284; *Reddick*, 157 F.3d at 722.

22        When evaluating a claimant's credibility, the ALJ must specifically identify what

23 testimony is not credible and what evidence undermines the claimant's complaints; general

24 findings are insufficient.  *Smolen*, 80 F.3d at 1284; *Reddick*, 157 F.3d at 722.  The ALJ may

consider "ordinary techniques of credibility evaluation" including a reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Smolen*, 80 F.3d at 1284; s*ee also Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

>    2.    *Discussion*

>        a.    Motivation for Benefits

The ALJ found plaintiff "appeared to be motivated by her desire to get benefits . . . ." AR at 209.  While it's somewhat unclear what evidence the ALJ relies on to support this statement, he seems to focus on one line from an April 29, 2009 medical examination by Dr. Rebecca Hendryx (plaintiff's examining physician), where plaintiff indicated "she is pursuing Social Security Disability Benefits but was told that she needed some objective findings to support her case." AR 187, 209.  The ALJ's reliance on this evidence to show plaintiff was motivated by a desire to get benefits, and to discredit plaintiff's credibility was improper.

It is unclear how plaintiff's statement to her doctor, that she was applying for Social Security Disability benefits, by itself and without more, indicates that plaintiff was motivated to get benefits, and no explanation is offered by the ALJ.  A mere statement by a patient to her doctor that she is applying for Social Security Disability Benefits is not clear and convincing evidence to discredit plaintiff.  Thus, "motivation for benefits" or "secondary gain" interests do not support the ALJ's lack of credibility finding.

>        b.    Alcohol Use

With respect to plaintiff's alcohol use, the ALJ stated:

> The claimant reported being abstinent from alcohol for one month in late April
> of 2009.  Earlier she reported drinking one pint of liquor per day.  She believed

her pain was worse without alcohol (Exhibit 5F/5, 8) . . . . [C]laimant was abusing alcohol at this time which makes her reports somewhat unreliable.

AR at 209.  The ALJ also stated:

> The claimant is found to be less than fully credible for many reasons.  The claimant has been somewhat inconsistent about her alcohol abuse and medication use.  The claimant's record notes that she has abused alcohol for much of the relevant period.  She had alcohol on her breath and had had three drinks when she went to the emergency room on September 11, 2007 at 7:40 p.m. (Exhibit 1F/2).  At the consultative examination with Dr. Ho the claimant reported she only drank about three times a week (Exhibit 2F/3).  She was intoxicated on February 16, 2010 after having four drinks that day (Exhibit 9F/28, 35).  The claimant later reported that she stopped drinking as of February 16, 2010 (Exhibit 10F/4).  However, she smelled like alcohol at a February 10, 2011 visit to the emergency room (Exhibit 9F/50).  This tends to cast doubt on the claimant's reports and testimony that she has been clean and sober since February of 2010.

AR at 211.  Plaintiff argues that her testimony regarding her alcohol use was consistent and that it has no relevance as to whether she was credible or not.  Dkt. 15 at 14.  The Court agrees with plaintiff.

With respect to plaintiff's alcohol use, there is no indication that plaintiff made inconsistent statements at the hearing, and the record seems to be consistent that plaintiff quit drinking sometime around 2010.  For example, during a March 4, 2010, examination by Dr. Hendryx, plaintiff told Dr. Hendryx that she stopped drinking on February 16, 2010.  AR at 621.  On October 18, 2011, Dr. Hendryx reiterated this point by indicating "[t]he plaintiff used to drink, she stopped drinking 2/16/2010."  AR at 628.  At the September 18, 2012 hearing, when asked about her alcohol use, plaintiff testified that prior to and around 2010, she used to drink alcohol "after work every day" and "that was the only thing that [she] could do just so [she] could relax . . . ."  AR at 274.  In addition, plaintiff indicated that she used to use alcohol to self medicate "when [her] pain got bad enough," but when asked when she stopped drinking, she said she had not been drinking for a "couple of years."  AR at 275.  Plaintiff's husband,

REPORT AND RECOMMENDATION - 10

Mr. Chip Proctor, testified at the same hearing and stated that plaintiff does not drink any

alcohol at all and when asked when she stopped indicated she had quit "over a year" ago.  AR

at 281.  These statements all indicate that plaintiff stopped drinking at about the 2010 time

frame and are largely consistent with one another.

Despite these statements, the ALJ discredited plaintiff based on a February 10, 2011

medical record indicating that during a visit to Mason General Hospital, the examining nurse

stated that plaintiff "smells of ETOH" (shorthand for ethanol).  AR at 614.  The ALJ reasoned

that this evidence "tends to cast doubt on the claimant's reports and testimony that she has

been clean and sober since February of 2010."  AR at 211.  This Court disagrees.

This one vague statement in a medical record is not clear and convincing evidence to

reject all of plaintiff's testimony regarding her alcohol use.  While the medical note indicates

plaintiff smelled of "ETOH" there is no evidence that she had actually been drinking.

Moreover, while the ALJ relies heavily on this piece of evidence to discredit plaintiff, he failed

to question her on this discrepancy in the record, despite having multiple opportunities to do

so.  Finally, if the ALJ believed alcohol use was the reason plaintiff was unable to work, he

should have conducted a DAA analysis.[3]

c.      Medication Use

With respect to plaintiff's medication use, the ALJ stated:

_____

[3] Pursuant to the Contract with America Advancement Act, an "individual shall not be considered to be disabled for purposes of Title II and Title XVI benefits if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  Pub. L. No. 104-121, 110 Stat. 847 (March 19, 1996) (codified at 42 U.S.C. 423(d)(2)(C), 1382c((a)(3)(J)).  Before applying this statute, however, an ALJ must first conduct the five-step sequential-evaluation process and conclude that the claimant is disabled.  *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001).  If a claimant is found to be disabled and there is medical evidence of plaintiff's DAA use, then the ALJ must apply the sequential-evaluation process a second time to determine whether plaintiff would still be disabled if he or she stopped using drugs and alcohol.  *Id*.  It is error for an ALJ to conclude that DAA precludes an award of benefits prior to applying the five-step process first.  *Id*.

REPORT AND RECOMMENDATION - 11

1

2

3

4

5

> The claimant's testimony about her pain medication was [sic] casts some doubt on the reliability of her statements.  At her May 15, 2012 appointment she was given twenty Tramadol per month and stated that they lasted ten days, but she was more functional during that time (Exhibit 10F/13).  However, at the hearing the claimant was evasive about her use of pain medication.  She testified that she now takes thirty per month, but then said no she took sixty per month.  She also did not testify as to how they made her more functional but would state that they took the edge off.  It is not entirely clear how much her pain medication helps or how much she takes, and that evasiveness casts doubt on the claimant's credibility.

6

7

8

AR at 211.  Plaintiff argues that there is no evidence she was evasive about her use of

medication, nor that she tried to hide anything regarding her medication use. Dkt. 15 at 14.

The Court agrees with plaintiff.

9

10

11

12

13

14

15

16

17

18

19

20

21

A review of plaintiff's testimony indicates nothing that would show plaintiff trying to

be evasive about her use of medication, nor any effort by plaintiff to try to confuse the ALJ

about the same.  Any confusion seems to have been on the part of the ALJ, stemming from the

January 30, 2013 hearing, where the ALJ asked plaintiff about her medication use.  *See* AR at

339-43.  After some back and forth between the ALJ and plaintiff, plaintiff, in an effort to

answer the ALJ's question and provide a clear answer, indicated that she was prescribed 30

Flexural and 30 Tramadol pills per month to deal with her pain.  AR at 342.  Plaintiff indicated

that she was moved up to 60 Tramadol pills per month (taken twice a day).  *Id*.  When asked to

clarify a note indicating that plaintiff took 20 Tramadol pills, plaintiff indicated that she only

took 20 pills the first time she was prescribed the medication, in order to see how the

medication would affect her.  AR at 343.  Thus, nothing in the record indicates plaintiff was

being vague about her medication use or was being evasive when answering the ALJ's

questions on the topic.

22

23

24

     d.  Failure to Exercise

  The ALJ found that:

REPORT AND RECOMMENDATION - 12

The claimant saw Dr. Hendryx on March 4, 2010 and reported increased pain when moving boxes (Exhibit 10F/4). In April of 2010 she reported that she was exercising daily including doing crunches (Exhibit 10F/7). Dr. Hendryx recommended that the claimant avoid exercises that involved bending and lifting and instead try daily walking on flat ground (Exhibit 10F/8). The claimant saw Dr. Hendryx again in May of 2011 and had tenderness to palpation with palpable muscle spasms. Dr. Hendryx continued to recommend daily walking on a flat surface but the claimant testified that she did not do the daily walking as recommended (Exhibit 10F/10). In October of 2011 the claimant reported continued back pain and having to frequently change positions. She was not doing regular stretching or direct pressure massage as recommended. The claimant had a palpable muscle spasm. The claimant was also encouraged to walk on a flat surface for thirty minutes, which she did not do (Exhibit 10F/11-12).

AR at 210. As a result, the ALJ discredited plaintiff for not following Dr. Hendryx's recommendations to exercise regularly.

Contrary to the ALJ's assertions, the record does not indicate that plaintiff blatantly disregarded Dr. Hendryx's recommendations. Rather, the record indicates that plaintiff tried to follow the doctor's instructions but found that her pain was too great. AR at 264. As a result of her increased pain due to exercise, Dr. Hendryx told plaintiff she should stop using the treadmill and to stop doing exercises that involved bending and lifting. *Id*.; *see also* AR at 33, 259, 270, 280, 624-25, 627, 629. Plaintiff also testified that despite this pain, she continued to try to exercise by "walking in place" but could only do so for a short period of time before her pain gets too great for her to bear. *Id*. Under these circumstances, it was wrong for the ALJ to discredit plaintiff based on an alleged failure to comply with the doctor's recommendations. As SSR 96-7p states:

. . . the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. *However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other*

REPORT AND RECOMMENDATION - 13

*information in the case record, that may explain infrequent or irregular medical
visits or failure to seek medical treatment.*

*See* SSR 96-7p (emphasis added).

e.      Seeking Further Treatment

The ALJ discredited plaintiff on the ground that she failed to get further treatment for

her impairments.  Specifically, the ALJ stated:

> The claimant reported significant pain improvement after an epidural injection
> but she has not sought one out recently (Exhibit 10F/14).  The claimant did not
> follow her doctor's recommendations and has not sought out additional
> treatment.  Although she does not have insurance, her husband does work and
> the claimant has been able to procure a free MRI in the past.  It appears that the
> claimant has made very little effort to get further treatment.

AR at 210.  Plaintiff argues the ALJ erred in discrediting her for this reason, because she did

not have insurance and could not afford to seek additional MRIs or see specialists for her back.

Dkt. 21 at 8; *see also* AR at 257-58, 278-79, 281, 340.  The Court agrees with plaintiff.

As stated in SSR 96-7p:

> . . . the adjudicator must not draw any inferences about an individual's
> symptoms and their functional effects from a failure to seek or pursue regular
> medical treatment without first considering any explanations that the individual
> may provide, or other information in the case record, that may explain
> infrequent or irregular medical visits or failure to seek medical treatment . . . .

SSR 96-7p.  SSR 96-7p goes on to state "[t]he explanations provided by the individual may

provide insight into the individual's credibility.  For example . . . . The individual may be

unable to afford treatment and may not have access to free or low-cost medical services." *Id*.

This is the case here.

The record indicates that plaintiff has consistently stated that her failure to seek

additional treatment was due to the fact that she does not have insurance and cannot afford to

obtain additional treatment.  AR at 257-58, 278-79, 281, 340.  While the ALJ acknowledges

that plaintiff's husband works and that she was able to procure a free MRI in the past, he fails

REPORT AND RECOMMENDATION - 14

to acknowledge that plaintiff's husband makes only $12.85 an hour, on which he has to support both plaintiff and himself, and is not provided insurance through his work.  AR at 257, 278-79. Moreover, the ALJ also fails to acknowledge testimony from plaintiff that her previous MRI cost $6,800, but the fee was waived only through charity.  AR at 257-58.  Finally, the ALJ fails to acknowledge testimony from plaintiff that seeing a specialist will cost over $200.  AR at 266.  The ALJ provides no explanation as to why he believes plaintiff can afford to pay these costs on an income of $12.85 an hour, nor does he provide any evidence or reasons as to why he believes plaintiff can obtain another MRI for free through charity.  Because the ALJ provides only cursory analysis and provides no explanation as to why he believes plaintiff can afford these additional services, given her husband's income and the expense associated with these additional treatments, the ALJ erred in discrediting plaintiff on the ground that she did not seek additional treatment.

f.      Daily Activities

The ALJ stated:

> The claimant's activities also cast doubt on her credibility.  While her ability to dust and do dishes does not necessarily show that she can work it does tend to show that she is capable of more than just "nesting" with heat and ice.  The claimant testified that very light household chores were all she was capable of. However, a review of the record shows that she was scrubbing a tub and carrying boxes during the relevant period (Exhibits 9F/39 and 10F/4).  If the claimant's reports were accurate and reliable she would not be able to engage in these activities as they involving [sic] lifting, bending, and reaching.  In addition, at none of the three hearings that have been held did she mention any of these activities which also casts doubt on the reliability of her reports.

AR at 211.  Plaintiff argues the ALJ erred in discrediting her on this basis because "the fact that [plaintiff] cleaned her bathtub and carried some boxes is not convincing reasons to reject all of her testimony."  Dkt. 15 at 14.  Moreover, plaintiff argues that these activities are not

transferable to work skills, and that plaintiff should not be penalized for attempting to lead a normal life.  *Id.* (citing *Reddick*, 157 F.3d at 722).  The Court agrees with plaintiff.

The Ninth Circuit has recognized "two grounds for using daily activities to form the basis of an adverse credibility determination." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).  First, such activities can "meet the threshold for transferable work skills." *Id.*  Thus, a claimant's credibility may be discounted if he or she "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." *Smolen*, 80 F.3d at 1284 n. 7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." *Id.*  The Ninth Circuit also has "recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722.  Under the second ground in *Orn*, a claimant's activities of daily living can "contradict his [or her] other testimony." *Orn*, 495 F.3d at 639.

Here, neither of the two grounds is present.  First, the ALJ fails to indicate how activities such as cleaning the bathroom and moving boxes are transferable work skills and therefore fails to show that plaintiff's activities are relevant to a discussion of her impairments.  Moreover, the ALJ fails to point to any evidence indicating that plaintiff spends a substantial part of her day doing these activities.  In fact, the evidence tends to show that plaintiff spends only a minimal time doing any type of housework and cannot do these tasks for very long before having to stop due to her impairments.  *See* AR at 28-29, 279, 339.

Second, there is no indication that plaintiff's activities, such as cleaning the bathtub or moving boxes contradicts her testimony that her impairments prevent her from being fully functional.  In fact, the record indicates that plaintiff was in a great deal of discomfort and/or pain after cleaning the bathtub and moving boxes.  *See* AR at 621 ("She had increased anxiety

REPORT AND RECOMMENDATION - 16

and pain when she was recently move [sic] boxes"), 602 ("She has had chest discomfort (since 1400 – after scrubbing bathtub")).  Thus, the record indicates that the more plaintiff exerts herself doing these activities, the more pain and discomfit she's in.

Finally, the ALJ's statement that "at none of the three hearings that have been held did [plaintiff] mention any of these activities," and as a result it "casts doubt on the reliability of her reports" is baseless.  A review of the hearing transcripts does not indicate plaintiff was being evasive or trying to hide the fact that she is able to clean her house or lift boxes.  In fact, she was more than willing to talk about these topics when asked.  For example, in response to a question regarding how much she is able to lift she answered "five to ten pounds."  AR at 28. When asked if she could do housework she answered "[w]hen I can, I try to do, you know, whatever housework I can do," but she also said "I have to take breaks."  AR at 28-29.  Thus, there is no indication that plaintiff was being evasive or trying to hide the fact that she did some housework.  Moreover, if the ALJ wanted to clear up any questions regarding this topic, he should have brought it up with the plaintiff at the hearings.

In light of the foregoing, the ALJ erred in discrediting plaintiff based on her daily activities.

#### g.     Exaggeration

The ALJ discredited plaintiff because, according to the ALJ, plaintiff "simply exaggerates her symptoms and limitations."  AR at 212.  In showing that plaintiff "exaggerates her symptoms," the ALJ first relied on the testimony of Dr. Anne Winkler, a non-examining medical expert, who testified at the September 18, 2012 hearing, that plaintiff exhibited four or five positive Waddell signs during a February 8, 2008 examination by Dr. Marie Ho, and also testified that Waddle signs "suggest symptom magnification."  *Id*.; AR at 252.  Relying on Dr. Winkler's statements, the ALJ concluded that because plaintiff exhibited these Waddell signs,

1   she was exaggerating her symptoms to Dr. Ho, and as a result, her statements regarding her

2   symptoms and Dr. Ho's report were not credible.  Second, the ALJ relied on Dr. Ho's medical

3   report, and on Dr. Joseph Elias' medical report, which found plaintiff to have relatively mild

4   limitations, to also come to the conclusion that plaintiff was exaggerating her symptoms.  AR

5   at 212.  Third, the ALJ relied on various other statements he claimed plaintiff made, regarding

6   how long she had to live, that she would be in a wheelchair if she continued the way she was,

7   and her ability to tolerate pain, as other examples of how plaintiff "exaggerates her symptoms."

8   *Id*.  The ALJ erred in discrediting plaintiff on these grounds.

9       A review of Dr. Winkler's testimony indicates that Dr. Winkler stated that Waddell

10  signs "suggest there may be some magnification symptoms" and that "there might be

11  magnification of [plaintiff's] complaints because of the positive Waddell sign."  AR at 252.

12  Use of the Waddell signs may, in fact, suggest exaggeration, and accordingly, the Court will

13  not find the ALJ erred by relying on positive Waddell signs.

14      However, the other bases for finding exaggeration are not supported in the record.  For

15  example, with respect to plaintiff's statements regarding how long she had to live, the ALJ

16  stated:

17          An example of the claimant's exaggeration include her statement in July of
            2008 that she had been told she only had six months to live.  There is no
18          evidence of this in the record and clearly it was not the case as the claimant is
            alive many years later (Example 5F/16)."
19

20  AR at 212.  A deeper look at plaintiff's statement indicates that it comes from a July 16, 2008

21  medical report by Dr. Hendryx.  The report states "[Plaintiff's] husband, who is present with

22  her today, states that they were told in the Emergency Room that she has 6 months to live.  The

23  Emergency Room records are not available for review."  AR at 197.  But, there is nothing in

24

the record to indicate that they weren't actually made to plaintiff and her husband or whether they were exaggerations on the part of plaintiff or her husband.

In addition, with respect to the statement made by plaintiff that she would end up in a wheelchair, the record indicates that plaintiff was merely reciting something that was said to her by a doctor.  The relevant part of the September 18, 2012 hearing transcript indicates so much.  *See* AR at 276 ("ALJ:  Who, who's the doctor that told you you'd be in a wheelchair if you kept working?  CLMT:  He was emergency room doctor at Mason County General Hospital emergency.  I'm sure that he was, I'm sure that he was basically saying that I can't continue to do what I'm doing.  I don't think he was serious that I would be in a wheelchair.").  Thus, the record indicates that plaintiff herself did not believe these statements, and in no way intended to use them to exaggerate her symptoms or limitations.

Although the presence of Waddell signs could be used to discredit plaintiff as exaggerating her symptoms and limitations, the overall flaws in the credibility analysis require remand.  The ALJ who has handled this case has made repeated errors in credibility determinations.  It is appropriate for the fourth hearing that a new set of eyes and ears preside over the rehearing, and the Appeals Council is directed to send this fourth rehearing to a new ALJ on remand for a complete *de novo* hearing.  Because this case is being sent back for a *de novo* hearing, the Court will not review all of the other issues presented.  However, to avoid a repetition of error, the Court will also pass along some other errors committed.

B.      The ALJ Erred in Evaluating the Medical Evidence

1.      *Standards for Reviewing Medical Evidence*

As a matter of law, more weight is given to a treating physician's opinion than to that of a non-treating physician because a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual."  *Magallanes v. Bowen*, 881 F.2d

1    747, 751 (9th Cir. 1989); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  A treating

2    physician's opinion, however, is not necessarily conclusive as to either a physical condition or

3    the ultimate issue of disability, and can be rejected, whether or not that opinion is contradicted.

4    *Magallanes*, 881 F.2d at 751.  If an ALJ rejects the opinion of a treating or examining

5    physician, the ALJ must give clear and convincing reasons for doing so if the opinion is not

6    contradicted by other evidence, and specific and legitimate reasons if it is.  *Reddick v. Chater*,

7    157 F.3d 715, 725 (9th Cir. 1988).  "This can be done by setting out a detailed and thorough

8    summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and

9    making findings."  *Id*. (citing *Magallanes*, 881 F.2d at 751).  The ALJ must do more than

10   merely state his/her conclusions.  "He must set forth his own interpretations and explain why

11   they, rather than the doctors', are correct."  *Id*. (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22

12   (9th Cir. 1988)).  Such conclusions must at all times be supported by substantial evidence.

13   *Reddick*, 157 F.3d at 725.

14          The opinions of examining physicians are to be given more weight than non-examining

15   physicians.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Like treating physicians, the

16   uncontradicted opinions of examining physicians may not be rejected without clear and

17   convincing evidence.  *Id*.  An ALJ may reject the controverted opinions of an examining

18   physician only by providing specific and legitimate reasons that are supported by the record.

19   *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

20          Opinions from non-examining medical sources are to be given less weight than treating

21   or examining doctors.  *Lester*, 81 F.3d at 831.  However, an ALJ must always evaluate the

22   opinions from such sources and may not simply ignore them.  In other words, an ALJ must

23   evaluate the opinion of a non-examining source and explain the weight given to it.  Social

24   Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2.  Although an ALJ generally gives

REPORT AND RECOMMENDATION - 20

more weight to an examining doctor's opinion than to a non-examining doctor's opinion, a

non-examining doctor's opinion may nonetheless constitute substantial evidence if it is

consistent with other independent evidence in the record.  *Thomas v. Barnhart*, 278 F.3d 947,

957 (9th Cir. 2002); *Orn*, 495 F.3d at 632-33.

> 2.    *Discussion*

> a.    Dr. Winkler

The ALJ erred by giving too much weight to the opinion of Dr. Winkler over the

opinions of examining physicians Drs. Marie Ho, Rebecca Hendryx, and Joseph Elias, who all

found plaintiff to either have severe limitations, or noted limitations due to her impairments.

At the September 18, 2012 hearing, Dr. Winkler, a non-examining medical expert, testified that

the record was consistent with a diagnosis that plaintiff suffered from fibromyalgia, scoliosis,

mild to moderate cervical degenerative disk disease, mild to moderate degenerative of the

lumbar spine, and some thyroid nodules.  AR at 231.  She acknowledged that plaintiff did

suffer from pain but indicated that she did not have any evidence, nor could she evaluate the

plaintiff's claims of subjective pain.  Dr. Winkler went on to testify that based on her review of

the record, she believed plaintiff would be limited to lift, carry no more than 20 pounds

occasionally and 10 pounds frequently, she would be able to stand and walk for six out of an

eight-hour day, there would not be any limit specifically in terms of sitting other than she

might need to shift position regularly from seated to seated, but that plaintiff would never be

able to climb ladders, ropes, or scaffolds, and never crawl, and that plaintiff should avoid

exposure to cold, wetness, and humidity.  AR at 232.  Dr. Winkler also testified that while

there was no proof that plaintiff was exaggerating her symptoms, there were concerns over the

severity of plaintiff's claims because, based on Dr. Marie Ho's medical notes, plaintiff

1    exhibited four or five positive Waddell signs during Dr. Ho's February 8, 2008 examination,

2    and also testified that Waddell signs "suggest symptom magnification." AR at 252.

3           The ALJ afforded Dr. Winkler's opinion "significant weight." AR at 212. The ALJ

4    found that "Dr. Winkler . . . had the opportunity to review the [plaintiff's] medical records and

5    her opinion [was] consistent with the objective evidence in those records." *Id*. Moreover, the

6    ALJ relied heavily on Dr. Winkler's testimony regarding the positive Waddell signs as

7    indication that plaintiff was exaggerating her symptoms. *Id*. However, a review of Dr.

8    Winkler's testimony, in addition to the medical opinions of Drs. Ho, Hendryx, and Elias,

9    reveals a lack of foundation for the ALJ's findings.

10          First, Dr. Winkler's testimony validates the standards for review of the medical

11   evidence set forth above. When she was asked how she determined the RFC limitations, Dr.

12   Winkler often had no reasonable explanation and indicated that there was no way to

13   completely know from the medical records what plaintiff's limitations were without a physical

14   examination. AR at 237 ("because we don't have all the information, it's certainly possible

15   that she might have enough scoliosis that might impact her walking"), 243 (indicating that she

16   could not determine what level of pain plaintiff was experiencing), 244 (acknowledging that

17   pain is very subjective and nobody can really tell the amount of pain someone is experiencing

18   with or without a physical exam), 246 (agreeing that plaintiff's diagnoses are medical

19   conditions that can reasonably be expected to cause some point and acknowledging she could

20   not tell from the records alone how often plaintiff would need to shift between sitting,

21   standing, and walking).

22          Second, almost all examining physicians who examined plaintiff found plaintiff to be

23   significantly limited due to her impairments and found her claims of pain to be credible. For

24   example, Dr. Ho, who examined the plaintiff on February 8, 2008, diagnosed plaintiff with

REPORT AND RECOMMENDATION - 22

scoliosis, fibromyalgia, sciatica, chronic neck and back pain, and joint pain.  AR at 168.

Moreover, Dr. Ho observed that plaintiff "walks with a slight limp," "she needs assistance

from her husband to take off her socks and shoes," "she is able to get on and off the table

slowly" and that "at times she does not appear to exert adequate effort, but this may be due to

the pain and inhibition," and that "she exhibits pain behavior."  AR at 166.  Moreover, Dr. Ho

found that plaintiff "is only able to lift the right heel one halfway to the opposite knee and the

left heel to the opposite shin, with complaint of low back pain," that she "is unable to toe and

heel walk, hop, or squat, due to neck and back pain," and "[s]he is able to bend" but when she

does she complains of "back pain in her entire back."  AR at 166-69.  As a result, Dr. Ho

limited plaintiff to "standing and walking cumulatively at least two hours in an eight-hour day,

due to limitations of the lumbar spine, the lower extremities, and fibromyalgia . . . and that she

may sit cumulatively up to six hours in an eight-hour day."  AR at 169.

Dr. Hendryx, plaintiff's long time treating physician, examined plaintiff on many

occasions from 2008 to 2012.  On July 16, 2008, Dr. Hendryx examined plaintiff for the first

time and found plaintiff was "visibly uncomfortable," and that "she stands for most of the

examination and moves around frequently."  AR at 198.  Moreover, Dr. Hendryx found

plaintiff's neck to be "supple," her "range of motion is limited secondary to pain," there was

"diffuse tenderness to palpation with palpable muscle spasm in the posterior neck and posterior

shoulders," plaintiff had "mild to moderate scoliosis," and there was "tenderness to palpation

with palpable spasms" in plaintiff's back.  *Id*.  On April 1, 2009, Dr. Hendryx examined

plaintiff again and found that a recent MRI showed "degenerative disk disease and facet

osteoarthritis."  AR at 189.  Moreover, the doctor noted plaintiff "stands for much of the exam,

consistent with history of back pain."  AR at 190.  On April 29, 2009, Dr. Hendryx examined

plaintiff again and found the plaintiff to have "chronic low back pain with exacerbations."  AR

1    at 187.  The doctor also noted plaintiff's "pain has been worse since she stopped drinking."

2    AR at 186.  On March 4, 2010, Dr. Hendryx examined plaintiff and noted that plaintiff "had

3    increased anxiety and pain when she was recently move [sic] boxes," and it was her impression

4    that plaintiff had "[c]hronic low back pain with radiculopathy."  AR at 621.   On April 29,

5    2010, Dr. Hendryx noted that plaintiff "is frustrated about her back pain.  She has been

6    exercising daily, including some abdominal crunches, trying to overcome her pain so that she

7    can go back to work but the exercises then exacerbate the pain."  AR at 624.  Again, Dr.

8    Hendryx noted that plaintiff "stands and moves frequently due to neck/back pain."  AR at 625.

9    On May 17, 2011, Dr. Hendryx noted that plaintiff "continues to get back pain, particularly in

10   her left lumbar paraspinal area" and that "[s]he has scoliosis."  AR at 626.  On October 18,

11   2011, Dr. Hendryx examined plaintiff and noted that plaintiff "continues to have frequent

12   exacerbations of chronic back pain," and that "[s]he has to frequently change positions (i.e.

13   from sitting to standing and vice versa).  AR at 628.  The doctor noted that plaintiff had

14   "palpable left lumbar paraspinal muscle knots/spasm which is tender to palpation," and that it

15   was her impression that plaintiff's "[c]hronic back pain [was] attributed to previous injuries

16   and degenerative joint disease but also triggering some muscle spasms."  AR at 629.  On May

17   15, 2012, Dr. Hendryx examined plaintiff and noted that plaintiff's pain "essentially rendered

18   her disabled" and her pain "continued to be relatively severe."  AR at 630.  The doctor also

19   noted that plaintiff "has had chronic neck pain and low back pain.  Pain is worse on the left

20   side than on the right.  She has numbness over her left anterior thigh and a sensation of

21   numbness across her low back."  *Id*.  The doctor also noted that plaintiff's pain was "worse

22   with sitting, standing/walking/weight-bearing and moving from sitting to standing position or

23   trying to lie down."  *Id*.  The doctor also found "tenderness over low back and left upper

24   lumbar area" and "loss of normal lordotic and cervical curvature."  AR at 631.  Dr. Hendryx

recommended that plaintiff see a specialist and when plaintiff gets insurance she should get an MRI.  *Id*.  On January 23, 2013, Dr. Hendryx opined that plaintiff was "[n]ot able to engage in manual labor.  She could probably be trained for a light or sedentary job but [she did not] have the capacity to evaluate . . . ."  AR at 656.  The doctor also found that plaintiff has "palpable right shoulder muscle spasm, cervical straightening, scoliosis, straitening of lordotic curvature, [and] lumbar paraspinal muscle tenderness."  *Id*.  The doctor stated that she found plaintiff's complaints to be credible and opined that if plaintiff had attempted even full time sedentary work since her alleged onset date of August 27, 2007, the combination of her medical impairments would have resulted in absenteeism of 3 or more days per month on a more probably than not basis.  AR at 657.

On September 29, 2012, Dr. Elias, a consultative physician, examined plaintiff with respect to her claimed physical impairments.  AR at 633-45.  Dr. Elias observed that plaintiff "initially preferred to be standing during the interview" but later sat down but tried to keep her left buttock off the chair" as she indicated that this hurt her.  AR at 643.  Dr. Elias noted that plaintiff could get on and off the exam table independently but that she "had a hard time bending forward to untie her shoes" and that "she was able to untie one shoe and then slip it off with her other foot, but that [he] had to take off the other shoe."  *Id*.  The doctor noted that during the entire shoe and sock removal process "her face was flushed."  *Id*.  The doctor also noted that plaintiff "ambulates putting her hands over her low back.  She has a slight antalgic gait leaning over the left hip."  *Id*.  Moreover, the doctor indicated that plaintiff's "[f]lexion was limited at 75 degrees by severe low back pain and extension limited to 10 degrees" but that her other joints where within the normal limits of motions.  AR at 643-44. The doctor generally found:

> [l]ow back exam was notable for left lumbar paravertebral muscle spasms as
> well as some tenderness along the left lumbar paraspinal muscles.  She had
> some tenderness along the right sacroiliac area.  She has some tenderness
> overlying the PSIS area.  Faber's test on the right is negative, on the left it
> exacerbates her painful area at the left PSIS.

AR at 644.  Ultimately, Dr. Elias concluded that plaintiff's "low back pain [is] likely secondary

to discogenic problems," but made no objective medical diagnosis regarding plaintiff's cervical

issues or fibromyalgia.  *Id*.

To elevate the testimony of a non-examining, non-treating physician over that of

treating and examining physicians is error.  It violates the standards of review of medical

evidence set forth above.  This is compounded by the fact that the ALJ made serious credibility

errors, and because the ALJ discounted certain medical opinions, based in part, on the

comments made to physicians by a "non-credible" plaintiff, the medical evidence must be

reviewed *de novo*.

C.    The ALJ Erred in Evaluating the Lay Witness Testimony

The ALJ gave the testimony of plaintiff's husband, Mr. Chip Proctor, "no weight"

arguing that Mr. Proctor's "appears to be relying or just repeating the claimant's subjective

complaints" and in light of plaintiff's "poor credibility . . . her reports cannot be relied upon,"

and by inference his reports cannot be relied upon. AR at 215.  The ALJ also stated that Mr.

Proctor's testimony about being able to hear plaintiff's consultative examination by Dr. Elias

was "not realistic." *Id*.  The ALJ's credibility errors require further review of the lay witness

testimony on remand.

VIII.   CONCLUSION

This case requires remand for further proceeding.  However, in light of the fact that this

will call for a fourth administrative hearing, the Court recommends that this case be

REVERSED and REMANDED to the Commissioner for a *de novo* hearing before a new ALJ.

REPORT AND RECOMMENDATION - 26

1  Objections to this Report and Recommendation, if any, should be filed with the Clerk

2  and served upon all parties to this suit by no later than **August 11, 2014**.  Failure to file

3  objections within the specified time may affect your right to appeal.  Objections should be

4  noted for consideration on the District Judge's motion calendar for the third Friday after they

5  are filed.  Responses to objections may be filed within **fourteen (14)** days after service of

6  objections.  If no timely objections are filed, the matter will be ready for consideration by the

7  District Judge on **August 15, 2014**.

8  DATED this 28th day of July, 2014.

9

10  _____
    JAMES P. DONOHUE

11  United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

REPORT AND RECOMMENDATION - 27